# United States District Court
### for the
### Western District of New York

| | |
|---|---|
| United States of America<br>v.<br><br>BRANDON TODD<br>―――――――――――――<br>Defendant | )<br>)<br>) Case No. 13-MJ-592<br>)<br>)<br>)<br>) |

FILED JUL 09 2013 MICHAEL J. ROEMER, CLERK WESTERN DISTRICT OF NY

## CRIMINAL COMPLAINT

I, BARRY W. COUCH, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about and between April 2013 and May 12, 2013, in the Western District of New York, the defendant violated 18 U.S.C. § 1201, an offense described as follows:

knowingly and willfully kidnapped a person when the person was willfully transported in interstate commerce or the offender traveled in interstate commerce in committing or in furtherance of the commission of the offense.

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT OF SPECIAL AGENT BARRY W. COUCH.

X   Continued on the attached sheet.

_____
Complainant's signature

SPECIAL AGENT BARRY W. COUCH, FBI
Printed name and title

Sworn to before me and signed in my presence.

Date: July 9, 2013

_____
Judge's signature

City and State: ROCHESTER, NEW YORK

HON. JONATHAN W. FELDMAN, U.S.M.J.
Printed name and title

**AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT**

STATE OF NEW YORK )
COUNTY OF MONROE  )     ss:            *13 mj 592*
CITY OF ROCHESTER )

   I, Barry W. Couch, having been first duly sworn, do hereby depose and state as follows:

   1. I am a Special Agent (SA) of the Federal Bureau of Investigation (FBI). I have been so employed since November, 2008. I am currently assigned to work criminal investigations, including those involving kidnapping.

   2. This affidavit is submitted for the limited purpose of establishing probable cause to believe that BRANDON TODD, born xx/xx/1993, kidnapped a person when the person was willfully transported in interstate commerce or the offender traveled in interstate commerce in committing or in furtherance of the commission of the offense, in violation of Title 18, United States Code, Section 1201.

   3. The information contained in this affidavit is based upon my personal knowledge and observation, my training and experience, conversations with other law enforcement officers and witnesses, and the review of documents and records. Because this affidavit is being

submitted for the limited purpose of securing a criminal complaint, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause that BRANDON TODD did knowingly violate Title 18, United States Code, Section 1201.

### PHONE CALLS FROM BRANDON TODD

4. Near the end of April or beginning of May 2013, I received a call from someone stating their name was Brandon Todd. Todd claimed to have information about people involved in human sex trafficking and wanted to provide that information to the FBI. Todd called back on an approximate daily basis speaking to myself, TFO Brian Tucker and TFO Chris Harrington for approximately two weeks, informing us that he was also involved in human sex trafficking and had connections to a group that was involved in the trafficking. Todd reported that he and the trafficking organization had multiple contacts in law enforcement that were used in the furtherance of the trafficking. Todd said that his role in the organization was to recruit girls and women and get them initially engaged in the trafficking. Todd stated that the reason he was calling the FBI was that he had recruited a certain woman, started to have personal feelings for her, and decided he did not want her involved with the trafficking. Todd said he had also decided that he wanted to help and try to get the other girls

out of the trafficking. During one of the last few calls with Todd, Todd stated that he was providing information, hoping that the FBI would assist him in locating the woman he had recruited and started to have feelings for, that he believed she was then in a hospital or shelter and he wanted to reconnect with her and have the FBI communicate to her that he was someone she could reconnect with. Also, during the phone discussions with Todd, a large topic of conversation was a certain missing person that Todd said he had information about.

5. A few days after my last conversation with Todd while he was still contacting me during the approximate two week period, I received a voicemail on my work phone from Cooperating Witness #1 (CW1), telling me that he had information on Cooperating Witness #2 (CW2). I did not recognize the names of either CW1 or CW2. I called the number that CW1 had left on my voicemail and spoke to CW1, identifying myself. CW1 very quickly gave the phone to CW2 who identified herself to me as CW2. After I responded to CW2 telling her I did not know who she or CW1 was, the phone hung up. Several days or possibly weeks after this call, I received a voicemail on my work phone from Cooperating Witness #3 (CW3), asking me to contact him. I did not recognize the name of CW3. I did contact CW3 by phone and he stated that he was the stepfather of CW1 and that CW1 had a long term girlfriend, CW2. CW3 said that he wanted to verify information that

3

CW2 relayed to him. CW3 said that CW2 told him that she had been held against her will in New York by a man named Brandon Todd, and that Todd was working with me and "the Feds." I informed CW3 that I would need to speak with CW2. A few days after my conversation with CW3, I received a call from CW1. CW1 told me that he and CW2 had hung up during their earlier call because I seemed to not know who they were and CW2 felt as though she did not know who to trust. CW1 relayed to me that CW2 had been held against her will by a Brandon Todd in New York. I also told CW1 that I would need to speak with CW2.

## CONVERSATION WITH CW2

6. On June 25, 2013, I received a phone call from CW2. I also spoke with CW2 on June 27, 2013, on July 5, 2013, and on July 8, 2013. CW2 reported that on April 19, 2013, she had taken a bus from West Palm, Florida, to San Diego, California. The purpose of her trip was to see her mother, get a car from her mother and look for a potential job. At some point during the bus ride, CW2 met Brandon Todd. Todd had gotten on the bus while it was en route with CW2 to San Diego. Todd ended up sitting next to CW2 and rode next to her for the remainder of the trip to San Diego. CW2 said that Todd would not leave her alone once he started talking to her. Upon arriving in San Diego, Todd recommended that they get a hotel and figure things out in the morning. CW2 knew it was not a good idea to accept Todd's offer, but agreed

4

to because she had very little money, she wanted to get rested and cleaned up before seeing her mother and Todd was persistent. CW2's plan was to get to a hotel and call someone she knew to get her.

7. Prior to arriving at the hotel, CW2 felt threatened by Todd. Todd told her he was affiliated with the Latin Kings gang, that he knew people in high places, that there was no point in her calling the police or mentioning excuses to get away. Todd told CW2, "My bitches don't run from me 'cuz I can make calls." CW2 said she knew that if she did not do what Todd said, he would have "his boys" find her and her family. Todd had said, "If you try to leave, I will find you. I have people that will find you."

8. After getting to the hotel, Todd said they were going to go to Wal-Mart to get "protection" and he made CW2 call a taxi. At Wal-Mart, Todd bought a machete and another knife, saying it was "to keep us safe." CW2 felt threatened by Todd having the machete and other knife. Back at the hotel, Todd made CW2 change into clothes he had purchased at Wal-Mart, telling CW2 he did not want her to stick out for any reason. Also, once back at the hotel, CW2 said that she did engage in sex with Todd, but added that she thought that he had really raped her. CW2 explained that she was just agreeing to have sex with Todd because she felt threatened by him and the machete was sitting next to the bed. CW2 stated that she was trying to do what

5

Todd said because she felt that he would kill her if she did not. Todd also took CW2's phone, broke it into three pieces and deposited the pieces in different places saying that he did not want them to be tracked.

9. CW2 and Todd were in California for less than two days when he put her and himself on a bus to New York. Prior to getting on the bus, CW2 said she felt threatened by comments Todd had made to her threatening her and her mother's safety. CW2 said that she got on the bus with Todd because she felt that he would hurt her or her mother if she did not go. Todd said he would have like "fifty dudes" show up and "shake" CW2's mom. CW2 stated that she felt that if she did not get on that bus and do everything Todd said, he would kill her parents and he would kill her. On the bus ride to New York, in or near Tulsa, Oklahoma, CW2 expressed to Todd her desire to call her father and see him. Todd responded by saying that if he saw CW2's father, he would kill him.

10. CW2 and Todd arrived into Rochester, New York, late at night. Upon arriving in Rochester, Todd told CW2 that his grandfather would be waiting for them in a car. Todd led CW2 to a green car and they got in. Todd's grandfather was in the car, but did not talk to CW2, would not look her in the eye, and did not seem to care that she was there. Todd referred to CW2 by a different name to

his grandfather. CW2 believed that they drove for approximately an hour and a half before arriving at Todd's grandparent's home that was in a wooded area. CW2 stated that she was terrified at that point.

11. Todd took CW2 to his bedroom, kept her there for approximately two and a half weeks, aside from a few outings outside the home. CW2 said that Todd would always keep his bedroom door locked. If she needed to go to the bathroom, CW2 stated that Todd would follow her into the bathroom, stand there while she went to the restroom and then direct her back into his bedroom. CW2 was only allowed to sleep from approximately 12:00 AM to 4:00 AM on the floor of Todd's bedroom with just a towel. CW2 reported that Todd would take off his belt and hit her with it. CW2 also said that Todd hurt her foot by stomping on it while he had steel-toed boots on. Todd told CW2 that he would make "the switch" with her or her mother. CW2 told me that she was aware of what "the switch" meant because of her friends' gang affiliations when she was growing up. CW2 said that she understood "the switch" to mean that either her or her mother would be killed.

12. CW2 reported that while in Todd's bedroom, Todd made and received telephone calls, and made arrangements for drug deals and to receive money. Todd had sex with CW2 in his bedroom several times a day. CW2 said that Todd also had several guns, including a hand

7

gun and a shotgun, which he wore. CW2 believed that Todd wore the guns as a scare tactic and thought that they were possibly airsoft-type guns.

13. CW2 stated that on one outing from Todd's house, Todd took her to the library to conduct a drug deal and she realized that she was in Naples, New York. CW2 was able to make contact with her boyfriend, CW1, via a payphone near the library and then later from a computer at the library on occasions when Todd took CW2 to the library. CW2 communicated to CW1 that she was in trouble and needed help, and that some guy was going to kill her. CW2 also communicated the library address to CW1. Approximately one to one and a half weeks after Todd brought CW2 to his house in Naples, New York, CW2 stated that she devised a plan to fake an asthma attack in order to get away from Todd. CW2 hoped that Todd would take her to a hospital. On May 12, 2013, CW2 reported that she faked an asthma attack and said that Todd took her to a hospital in Bath, New York. CW2 remembered the name "Davenport" being associated with the hospital.

14. At the hospital, CW2 spoke with the New York State Police (NYSP). CW2 told them that she was working with "the Feds." CW2 told me that she was under the impression that she was working with me, because Todd had told her that he was talking with me and that they were working with me. Todd had told CW2 that he worked with "the Feds"

8

as a "CI." Todd had also told CW2 that if she talked with anyone other than "the Feds," she would be arrested and charged with a crime, so CW2 stated that she was too scared to tell the NYSP the specifics of what had happened to her. After the police left, CW2 fell asleep, and then CW1 arrived at the hospital. CW1 received a call from CW2 on May 12, 2013, while she was on her way to the hospital. Todd allowed CW2 to make a phone call believing that CW2 was calling a friend to tell the friend that she was ok. CW2 was cryptic in the call, but was able to tell CW1 that Todd was taking her to a hospital in Canandaigua. CW1 said that while he was driving en route to Canandaigua, he received a call from a nurse at the hospital in Bath, who informed him that CW2 was there. CW2 was discharged from the hospital with CW1 and they drove back to Florida. CW2 stated that Todd still had one of CW2's suitcases with her name on it. She described the suitcase as a light, cobalt blue roller suitcase.

15. CW2 communicated that she was on her way back to Florida with CW1 when they called me and had hung up on me. CW2 said that she knew in that moment on the phone with me that she had heard my voice before. CW2 confirmed that while she was with Todd, Todd would be on the phone for long conversations with who he said was the FBI discussing the missing person referred to in paragraph 4 above. Todd also put the phone on speaker sometimes so CW2 could hear some of the conversations.

9

**MISSING PERSON REPORT**

16. On June 28, 2013, TFO Harrington obtained a missing person report from the San Diego Police Department, filed by Cooperating Witness #4 (CW4), CW2's mother. The report stated that on April 24, 2013, CW4 reported that her daughter, CW2, was missing. CW4 said that she last spoke with CW2 on April 19, 2013. CW4 said that CW2 had told her that she was heading to San Diego on a Greyhound bus from Florida. CW4 stated that on April 21, 2013, CW2 texted CW4 that she only had two stops left before she was in San Diego and the bus seemed to be on time. CW4 reported that after that text, CW2 was unable to be reached by text or phone call and she had not been heard from since. The missing person report then states that San Diego Police talked with Cooperating Witness #5 (CW5). CW4 had reported that CW2 had told her that she had been in contact with CW5 and he was supposed to pick CW2 up from the bus station. CW2 told CW4 that she was going to stay with CW5 in San Diego. When questioned, CW5 told the San Diego Police that he last heard from CW2 on April 21, 2013. CW5 said he went to the bus stop at the time CW2 was scheduled to arrive and that he waited for her, but she never showed up.

**<u>MEDICAL RECORDS - IRA DAVENPORT MEMORIAL HOSPITAL, BATH, NY</u>**

17.  On July 2, 2013, the Ira Davenport Memorial Hospital in Bath, New York, responded to a Federal Grand Jury Subpoena. The hospital's records showed that CW2 was admitted to and discharged from the hospital on May 12, 2013. The records listed CW2's next of kin as: Brandon Todd, 11538 Blacklock Hill Road, Naples, New York 14512, 585-374-2557. The hospital records contained the following information in a report: "this writer went in to room to discharge pt (patient), pt states 'please don't make me leave, he is dangerous and I have been trapped in his house for the last 3 weeks' when this writer asks if the man with her hurts her she states, "yes, please don't make me leave'. Pt is unable to give her address and states, 'I'm not from around here.' Later, the nurse writes in the report, "state troopers here to speak with pt. pt remains weeping, young man that was outside room waiting for pt has left the building."

18.  On June 26, 2013, I spoke with New York State Police Investigator Marcy Trimble. Investigator Trimble said that she spoke with CW2 at the hospital in Bath, New York on May 12, 2013. Investigator Trimble stated that CW2 was not cooperative and advised that she did not want to press charges and that she was working with "the Feds."

## GREYHOUND BUS RECORDS

19. On June 27, 2013, TFO Harrington and I went to the Greyhound Bus Station in Rochester, New York. There, we spoke to bus station employees who provided us with bus records showing the following: On April 19, 2013, CW2 was reserved to be on a bus from West Palm Beach, Florida, to San Diego, California. On April 19, 2013, Brandon Todd was reserved to be on a bus from Rochester, New York, to San Diego, California. On April 24, 2013, both Brandon Todd and CW2 were reserved to be on a bus from San Diego, California, to Rochester, New York.

## RECORDED TELEPHONE CALL WITH BRANDOND TODD

20. On June 28, 2013, Brandon Todd called the FBI, asked to speak with me, and provided the phone number 585-374-2557. TFO Harrington and I called Todd back that day and had a conversation with him and recorded the phone call. Todd communicated that he had information on drug activity and that he wanted to provide the information to the FBI. Todd stated that he was hoping to receive some assistance with the District Attorney on a case pending against him. At the beginning of the conversation, Todd started talking about getting immunity for things. At that point, I informed Todd multiple times that we could not promise or guarantee him anything.

21. During the recorded conversation, I mentioned to Todd that he had previously asked us for help locating a female that he thought was in a shelter. Todd confirmed that the female that he wanted help locating was the girl that he had previously told us about, who he had recruited and then started falling for when he was involved in the sex trafficking ring. I asked him what the female's name was, to which he responded, "(CW2's first name)." I asked Todd what his role was in the sex trafficking ring, and he stated that he would do what he was told. Todd said that with CW2, he convinced her over some drinks and talked to her about making some money, and that her trust level started to grow. When I asked Todd if it would ever get to the point where he would have to threaten somebody to stay with him, he responded, "Yea. Threaten somebody, you know. Threaten their family. I've had to go through it more than once." I then asked Todd if that's what he had to do with CW2, was threaten her. Todd responded, "Yea". I then asked Todd, how he would make his threats real when females stayed with him, "like with (CW2)," and Todd responded, "You use force, use weapons, use knives, you know, give 'em a beating…You know, threaten their families to start, you know." When I asked him where the situation with CW2 took place, Todd responded, "Cali". When I asked Todd how the threats worked, he said, "Well, like you yell. You know, like if they don't listen to you, you yell at 'em. You know, you threaten 'em, you beat 'em, you know. You, you know, I've seen

13

a couple of girls bleed before. You know, you go to their parents' houses, you know, you pretty much harass their family, you know, follow their family around." When asked what town or city they were in at the time, Todd responded, "We were in San Diego." I asked Todd if he had any weapons when he was with CW2, and Todd responded, "Yea. I always had weapons on me." When asked what kind of weapons, Todd replied, "A blade." Later in the conversation, Todd, referring to CW2, stated, "Anytime you know, like, under you know, under what I've been taught, you know, she, you know, she wasn't allowed at any time to leave my sight."

### STEUBEN COUNTY FAMILY COURT RECORDS

22. On July 3, 2013, TFO Harrington obtained a copy of a Family Offense Petition from the Steuben County Family Court filed by Brandon Todd of 11538 Blacklock Road, Naples, New York, on June 18, 2013, against CW2. In the petition, Todd claims to be CW2's fiancé, and argues that five bills from the hospital associated with CW2 came to his residence. Todd stated in the petition, "On 5-12-13 I dropped (CW2) off at Ira davenport memorial hospital. I left the hospital around 4:30-5:00pm." Todd later lists the bills that came to his

14

Naples residence as being from Ira Davenport Memorial Hospital, Radiologists of the Fingerlakes and Dephi Healthcare PLLC.

### JULY 5, 2013 INTERVIEW WITH CW2

23. On July 5, 2013, I met with CW2. She described Brandon Todd's residence at 11538 Black Lock Hill Road, as a single story residence, white in color, with a mailbox near the road that approaches the residential property with the numbers "11538" appearing to be stickers on the mailbox. CW2 positively identified Todd's residence, 11538 Black Lock Hill Road, Naples, New York, on a Google maps application on a computer in the Rochester FBI Office. CW2 described the towel she slept with in Todd's bedroom, referred to in paragraph 11 above, as being peach in color. CW2 described the phones used by Todd and her, referred to in paragraph 12 above, as being multiple cellular phones. CW2 confirmed that the color of her luggage that should still be at Todd's residence is blue colored and that inside of that luggage should be black colored work clothes to include her pencil skirt dress, black velvet dress shoes, the black shirt and Dickies pants Todd had purchased at Wal-Mart, and underwear that Todd said belonged to his sister that he gave CW2 to wear after he threw CW2's away. CW2 said that her hair dryer with flowers on

the handle and a black strait iron should still be at Todd's residence as well. CW2 also recalled that Todd had a black duffle bag with him on the bus ride.

24. On July 5, 2013, CW2 identified BRANDON TODD, in a photo array placed before her, as the person referred to in this affidavit that kidnapped her. CW2 also positively identified the voice in the recorded telephone call referred to in paragraph 20 above as being the voice of BRANDON TODD, the person referred to in this affidavit who kidnapped her.

## CONCLUSION

25. Based upon the foregoing, your affiant respectfully submits that there is probable cause to believe that BRANDON TODD has violated Title 18, United States Code, Section 1201, kidnapping a person when the person was willfully transported in interstate commerce or the offender traveled in interstate commerce in committing or in furtherance of the commission of the offense. In light of the ongoing nature of the investigation, and the possibility of seriously jeopardizing the effectiveness of the investigation if information were made public, your affiant respectfully requests that the complaint and accompanying application remain sealed for a period of sixty days.

_____
BARRY W. COUCH
Special Agent
Federal Bureau of Investigation

Sworn to before me this
___ day of July 2013.

_____
HONORABLE JONATHAN W. FELDMAN
United States Magistrate Judge